UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



KIMBERLY JEAN SCHEURER,

        Plaintiff,

    v.

NANCY A BERRYHILL,[1]
Acting Commissioner of the Social Security
Administration,

        Defendant.

**DECISION AND ORDER**

6:16-CV-06142 EAW

## INTRODUCTION

Plaintiff Kimberly Jean Scheurer ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) and seeks review of the final decision of Nancy A. Berryhill, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. 9; Dkt. 17).

## BACKGROUND

### I.    Overview

On October 26, 2010, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (Administrative Transcript ("Tr.") 151, 332). In her

---

[1]    Nancy A. Berryhill became Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted as the defendant in this suit.

application, Plaintiff alleged that she had been disabled since January 1, 2010, due to symptoms arising from bipolar disorder. (Tr. 151, 332). Plaintiff's claim was initially denied on February 10, 2011. (Tr. 169). Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on March 14, 2011. (Tr. 176). Plaintiff appeared and testified at a hearing in Rochester, New York on March 5, 2012, as did Mary Beth Kopar, a vocational expert ("VE"). (Tr. 41). ALJ Andrew Henningfeld presided over the hearing. (*Id.*). On April 6, 2012, ALJ Henningfeld issued a decision denying Plaintiff's claim. (Tr. 144-59). Plaintiff requested that the Appeals Counsel review ALJ Henningfeld's decision. (Tr. 165). The Appeals Counsel granted Plaintiff's request and remanded the matter to ALJ Connor O' Brien on September 13, 2013. (Tr. 165-67).

Plaintiff appeared at a second hearing before ALJ O'Brien on December 17, 2014, in Rochester, New York, as did VE Carol G. McManus. (Tr. 104). ALJ O'Brien issued a decision denying Plaintiff's claim on May 12, 2015. (Tr. 17-33). Plaintiff once again sought review by the Appeals Council, which denied her request on January 11, 2016. (Tr. 5). Plaintiff commenced this action on March 7, 2016. (Dkt. 1).

### A. The Non-Medical Evidence

#### 1. First Hearing: March 5, 2012

##### a. Plaintiff's Testimony

On March 5, 2012, Plaintiff, who was 44 years old, appeared before ALJ Henningfeld. (Tr. 41, 50). She had completed two years of college, was 5'4" tall, and weighed 155 pounds. (*Id.*). Plaintiff's last job was with The Democrat and Chronicle, a

newspaper located in Rochester, New York and owned by Gannett Newspapers. (*Id.*). Plaintiff held a sales and service position in classified advertising, where she took calls in a "call center environment." (*Id.*). The job ended in July 2009 after a "massive layoff" of 1,000 employees. (Tr. 51). Plaintiff was unable to find work since the layoff, explaining that she had not "been able to find anything that seemed to fit, and then [she] became very ill." (*Id.*). Plaintiff also stated that, had the layoff not occurred, she would have most likely been unable to continue at the job due to her reaction to Paxil, a drug she had taken for bipolar disorder. (Tr. 51-52).

Plaintiff testified that she suffered from severe depression when she first filed for disability in January 2010, and that there had been "eight months where [she] couldn't even get out of bed." (Tr. 52-53). She had received unemployment benefits until 2011. (Tr. 53). During that time, Plaintiff continued to look for work "to the best of [her] ability," (*id.*); she used job search websites and enlisted the help of her friends (Tr. 56). Plaintiff stated that if she had received a job offer, she would have pursued it despite her depression. (Tr. 56).

For eight months, the only things Plaintiff could do, aside from lay in bed, were use the bathroom and get herself water. (Tr. 54). She tried to care for her children, but "did a pretty bad job of it" and relied on help from her husband, children, and mother-in-law. (*Id.*). In October 2010, Plaintiff started attending bipolar support groups. (Tr. 53).

Before experiencing a depressive period, Plaintiff went through a manic period in the fall of 2009. (Tr. 54-55). During this time, she tried to start a business for spiritual consultations and felt "invincible," but did not realize she was sick. (*Id.*). She rented

office space, used money from her 401(k) to buy a car, and would hang out for drinks with friends. (Tr. 54-55, 80, 89). Plaintiff used funds from her unemployment compensation to pay for the rent in her office space. (Tr. 92-93).

Plaintiff testified that her medication for her illness was "still a process." (Tr. 58). In 2007, she was incorrectly diagnosed with seasonal affective disorder, for which she was prescribed anti-depressants. (*Id.*). The anti-depressants made her become psychotic. (*Id.*). Three years later, she was diagnosed with bipolar disorder, for which she was prescribed a mood stabilizer, and later, Paxil—an anti-depressant. (*Id.*). Paxil helped her out of her initial depression, but it kept her mood cycling. (*Id.*). In December 2011, she was taken off Paxil and given a different mood stabilizer. (Tr. 59). She was currently taking Depakote, which was helpful, but she believed the dosage was a little high. (*Id.*).

The ALJ asked Plaintiff about a specific note from a doctor's visit on January 12, 2012, where Plaintiff had reported doing well and had refused an increase in Depakote. (Tr. 60). Plaintiff was unsure of exactly what the note meant, but she believed that the doctor was commenting on her dosage because "that's really . . . the only thing [Plaintiff] would say anything positive about because . . . that particular visit there was a lot of crisis that [she] had just come out of." (Tr. 65). Plaintiff also stated that sometimes when she believed she was doing well or she felt that the medication was working, she was "completely wrong." (Tr. 65-66).

Plaintiff testified that her family had been experiencing conflict; in particular, her husband was at times fearful of and angry about her manic episodes, and they faced financial difficulty. (Tr. 66). Plaintiff testified that her daughter had slapped her because

her daughter was "still very angry about the time [Plaintiff] left" and did not understand that it was Plaintiff's illness—specifically a manic episode—that caused Plaintiff to leave her family. (Tr. 67-68). After her daughter slapped her, Plaintiff called the police because she was stressed and wanted her husband to stop yelling; she felt threatened. (*Id*.). After this incident, she left to reside with a friend. (Tr. 70). She came back home after she had a conflict with the friend, who purportedly came home in an "alcoholic rage" and became embroiled in a physical altercation with Plaintiff. (Tr. 71).

The ALJ further questioned Plaintiff about the period in the fall of 2009 when she left the family home. (Tr. 69). Plaintiff would go home to see her children and to shower, but she slept at her office space. (*Id*.). She returned to the home in December of 2009. (Tr. 70). Plaintiff believed her bipolar disorder exacerbated her marital difficulties, and that conflict in her family began to increase in the fall of 2009. (*Id*.). Plaintiff viewed "the family problems and illness as interchangeable." (Tr. 71).

Plaintiff could read but had difficulty concentrating, and she could care for herself but also had trouble doing so on occasion. (Tr. 72). Her only activity was participating in her self-help group, and she usually could complete household chores. (Tr. 73). Her husband did most of the cooking and, aside from simple things such as making sandwiches, Plaintiff would just reheat food he had made. (Tr. 75). Plaintiff could drive, but she did not do so because she was uncomfortable driving on her medication. (Tr. 76). However, Plaintiff did drive to her support group and to run errands. (*Id*.).

Plaintiff testified that she used marijuana socially before her diagnosis, from the age of 20 until December of 2009, (Tr. 77), but she had not used marijuana or alcohol since December of 2009 (Tr. 80).

Plaintiff's attorney then questioned Plaintiff. (Tr. 82). Plaintiff testified that she had left a job as a leasing agent at Waverly Wood Apartments for a better position with higher pay because she was manic. (*Id.*). Plaintiff had trouble getting along with coworkers and supervisors due to her symptoms, and any sort of stress made her symptoms worse. (Tr. 83). Plaintiff tried to remove herself from stressful situations and find a way to calm down. (*Id.*). She also testified that sometimes, when she thought that her symptoms were under control, others would tell her they were not. (Tr. 84).

During Plaintiff's eight-month period of depression, she testified that she attempted to hurt or kill herself by jumping from a moving car. (Tr. 87). Plaintiff's mother-in-law prevented her from jumping by pulling the car over, and then she took Plaintiff back home. (*Id.*). Plaintiff believed that she should have been hospitalized, but no one understood what was going on with her illness. (*Id.*)

Plaintiff was initially treated by Dr. Wendy Rosen, a psychiatrist, but she had to change to Nurse Practitioner ("NP") Marilyn Sullivan because her insurance plan changed. (Tr. 90). Plaintiff was still struggling to control her symptoms, (Tr. 92), but she desired to return to work and be functional and productive (Tr. 101).

### b.    Vocational Expert's Testimony

VE Kopar described Plaintiff's work history, and the associated exertional levels required of an advertising clerk (semi-skilled, sedentary exertion) and a leasing agent

(skilled, light exertion). (Tr. 95-96). The ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience who could:

> Perform work at all exertional levels, with no climbing of ladders, ropes, or scaffolds. Work involves understanding, carrying out and remembering no more than a few simple instructions. Work is routine and repetitive, involving only a few if any changes in the work setting, no fast paced production rate work, work does not involve hazards such as dangerous moving mechanical parts or machinery that could cause bodily injury or work in height exposed places. Work involves no more than occasional interaction with the public, supervisor or coworkers, and work tasks are well defined requiring no more than occasional simple decision making or use of independent judgment to compete tasks.

(Tr. 96). The ALJ asked the VE whether such a hypothetical person could perform any of Plaintiff's past relevant work; the VE responded that such a person could not. (Tr. 96-97). The ALJ then asked if there was other work in the national economy that this hypothetical person could perform. (*Id.*). The VE said that such a person could work as: (1) a laundry worker (unskilled, medium exertion), for which there were over 200,000 positions in the national economy and 6,000 in New York State; (2) a cleaner (unskilled, light exertion), for which there were over 1,000,000 positions in the national economy and 30,000 in New York State; and (3) a sorter (unskilled, light exertion), for which there were over 300,000 positions in the national economy and 72,000 regionally. (Tr. 97).

The ALJ then asked the VE about the customary tolerance levels of an employer regarding breaks and absences. (*Id.*). VE Kopar testified that for unskilled work, employers would typically tolerate one half day to one day per month of employee absence, totaling 6 to 12 days a year. (*Id.*). She further testified that an employer would customarily permit two 15-minute breaks and a half hour lunch during a work day, and

would tolerate an employee being off task for 15 percent of a work day. (Tr. 98). Employer tolerances for unscheduled breaks would depend on the employer and whether the break took place at the employee's work station. (*Id.*).

### 2. Second Hearing: December 17, 2014

#### a. Plaintiff's Testimony

At the time of the second hearing held before ALJ O'Brien, Plaintiff was 46 years old. (Tr. 109). Plaintiff reiterated her personal information, including her living situation, height, weight, and education. (Tr. 109-10). While working at The Democrat and Chronicle, Plaintiff received a certification in "Mac art, Mac design," but since then, computer technology and graphic arts had changed significantly. (Tr. 110-11). Plaintiff could drive, but she would not drive on expressways or after dark. (Tr. 112).

ALJ O'Brien next asked about Plaintiff's most recent job as a classified ad taker at the Democrat and Chronicle, as well as jobs she had previously held. (Tr. 113). At the newspaper, she would handle incoming calls for ads, and she sometimes had to make outgoing calls. (*Id.*). Plaintiff testified that this was the most difficult part of the job, and while she would do well during manic episodes, depressive periods made it impossible for her to "even lift the phone." (*Id.*). She performed her work while seated, and had to take a certain number of calls to meet a quota. (*Id.*).

Prior to her job at The Democrat and Chronicle, Plaintiff worked "taking text" for Nothnagle for two months. (Tr. 113-14). Plaintiff would review real estate listings for typographical errors and send them to newspapers or other print sources. (Tr. 114).

Prior to Nothnagle, Plaintiff held a positon at Webster Manor Apartments. (*Id.*). Plaintiff worked part-time as a rental agent, who would take prospective tenants to view apartments. (Tr. 115). She had also worked at Waverly Wood Apartments in a similar positon. (*Id.*). Plaintiff briefly worked at Greater Rochester Advertisers, and prior to that she held a part-time positon at Geva Theatre where she made sales calls. (Tr. 116). Plaintiff had also worked part-time at Rochester Info-Courses, where she registered guests, baked cookies, and worked in the bookstore. (Tr. 118-120).

ALJ O'Brien asked Plaintiff why she felt she could not work. (Tr. 120). Plaintiff stated:

> [F]rom day to day I don't know where I'm going to be. I don't know emotionally what state I'm going to be in. Currently I'm very weepy. I have actually said to my husband that I am suicidal, within the last month. . . . I have a very limited capacity to be around people. I don't–at my best I believe I could be around people for maybe an hour or so, and then I need to go home. I need to retreat and kind of rebuild my strength, my energy. Even on my best days I have to lay down for two hours a day and recharge . . . . It's just that not knowing if I'm going to have an up or a down day. . . . I don't know how I, I come cross to people. Sometimes I, I believe I'm really doing very well, and I realize later on that I didn't come across as doing very well at all.

(Tr. 121). Plaintiff indicated that she was on Depakote and was taking Klonopin as needed. (Tr. 121-22). Plaintiff also testified that she used to participate in self-help groups, but had been doing so less frequently. (Tr. 123). Plaintiff stated further that she had held a leadership role in her self-help groups for about two months, but she had stopped because it "became exhausting" for her. (*Id.*). She also attempted to start a meditation group which she said "kind of fell apart too." (Tr. 124).

Plaintiff testified that there was still a lot of stress in her home, but she and her husband had been trying to keep things calm for her daughter's sake during the holidays. (Tr. 125). She stated that she and her husband had been attending counseling together, but she did not find it helpful. (*Id.*).

ALJ O'Brien then asked Plaintiff about her health care providers. (Tr. 126). Dr. Rosen was Plaintiff's first psychiatrist to diagnose her with bipolar disorder. (*Id.*). Plaintiff transferred from Dr. Rosen to NP Sullivan due to an insurance issue. (*Id.*). While receiving treatment from NP Sullivan, Plaintiff went to Dr. Jennifer Fleeman for therapy. (Tr. 127). At the time of the hearing, Plaintiff's psychiatrist was Dr. Eric Rennert. (Tr. 126).

The ALJ asked about a specific note written by NP Sullivan, which stated that Plaintiff was in remission. (Tr. 127). Plaintiff said that she "did not agree with anything that Lyn Sullivan did when she was [Plaintiff's] doctor." (Tr. 128). According to Plaintiff, NP Sullivan's records were inaccurate. (*Id.*). ALJ O'Brien mentioned that NP Sullivan noted that Plaintiff used marijuana twice in 2011, even though other evidence in the record indicated that she stopped using marijuana in December of 2009. (*Id.*).

Plaintiff then testified about the time she had left the family home due to a manic episode. (Tr. 128-29). Plaintiff stated that she was "sure there was alcohol and marijuana use" during this time, but she did not remember it well. (Tr. 129). She testified that she had not used marijuana since 2009. (Tr. 130). In 2011, she had a conversation with Dr. Rosen relating to her past marijuana use, and Dr. Rosen became upset because marijuana could conflict with Plaintiff's medication. (*Id.*).

ALJ O'Brien asked Plaintiff to describe a typical day. (Tr. 131). Plaintiff said:

I get up in the morning at 6:00. I make sure that my son is up. I usually go in a few times and make sure that he is. I try to get him to eat breakfast, but he usually doesn't. So I make sure he leaves with a water bottle . . . I feel it's important to be there when he wakes up in the morning and when he comes home from school, so I try and arrange my day so that I'm there for that. Once he's off to school I usually have a cup of coffee to wake up, and that's when I just start to pick up around the house. Depending on my energy level, sometimes I can do that pretty quickly, and other times I have to take a lot of breaks. I try to plan my day around whatever has to be done outside of the house.

(*Id.*). Plaintiff would drive, but she was only comfortable driving to her two doctors' offices and to group therapy. (*Id.*). Plaintiff stated that after her son came back from school, she would usually make him soup, and then they would both nap. (Tr. 132). Her husband prepared dinner, and depending on how she felt, she would clean up after dinner or leave it for the next day. (*Id.*). Plaintiff's "biggest goal" at the time was being present for her children. (Tr. 133). Plaintiff's circle of friends consisted mostly of people she met through her self-help group. (*Id.*). She did not participate in any religious groups, clubs, or activities, and attended only required school events for her son. (Tr. 134).

Plaintiff believed that her illness negatively affected her job performance at The Democrat and Chronicle. (*Id.*).

There were times that just showing up was the most I could do. There were times just sitting at the desk and kind of try [sic] to figure out what I'm doing. I was spending a lot more time conversationally with people. That was something I was told was a problem because they wanted me to move quicker on the calls. And I was doing more talking than actually moving people through. Making the outbound calls became a problem.

(Tr. 134-35). Plaintiff confirmed that other employees in similar positions kept their jobs after the layoff. (Tr. 135).

Plaintiff stated that she had not discussed the possibility of working with her doctors or therapist; although she had told them she believed she was unable to work, her doctors were focused on addressing other issues. (*Id.*). Plaintiff also testified that if she departed from her daily routine, "things [got] messed up." (*Id.*). Plaintiff would lie down every day, sometimes for longer than two hours. (Tr. 136).

Plaintiff then described her medications. (*Id.*). She stated that she had been on Lithium, but that it made her "very ill." (*Id.*). Plaintiff testified that she had been having issues with her dosage of Depakote, but this problem had been since resolved. (*Id.*). As for household chores, Plaintiff stated that she was not scrubbing floors or tubs, and that, "on a good day," the most she could do was wash dishes or do laundry. (Tr. 137).

### b. Testimony of Vocational Expert

VE McManus identified four of Plaintiff's past job titles and the nature of the work: sales representative (light), telephone solicitor (sedentary), order clerk, advertising (sedentary), and apartment rental agent (light). (Tr. 138).

ALJ O'Brien then asked VE McManus to assume a hypothetical person with the following characteristics:

> [T]here are no exertional limitations. However, the individual cannot climb a rope, ladder, or scaffolding, and needs to avoid hazards such as open waters or unprotected heights. The individual can perform simple and some detailed tasks, but not complex. The individual can tolerate no more than occasional changes in work setting. The individual can work to meet daily goals, but not maintain an hourly machine-driven assembly line production rate. She can occasionally interact with the public. She cannot perform teamwork. She can occasionally make work-related judgments or decisions. She requires up to three short less than five-minute breaks in addition to regularly scheduled breaks.

(*Id.*).  VE McManus testified that someone with those limitations would not be able to perform Plaintiff's past relevant work.  (*Id.*).  She testified that there was other work in the national economy that someone with those limitations—and of Plaintiff's age, educational level, and background—could perform.  (Tr. 139).  The VE suggested the following positons: (1) shelving clerk in a library (a light exertion position, with 101,990 jobs in the national economy); (2) food service worker in a hospital (a medium exertion position, with 244,820 jobs in the national economy); and (3) medical records clerk (a light exertion position, with 180,760 jobs in the national economy).  (Tr. 139-40).

ALJ O'Brien posed another hypothetical person with all of the same characteristics as the first hypothetical, except as follows:

> [R]educe it down to simple work with three steps—three-step tasks. Reduce it down to occasional interaction with the public, but at <u>DOT</u> people function levels 6, 7 and 8, that's speaking, signaling, serving, and helping her take instructions.  And reduce the—rather than no more than occasional, changes in work setting are going to be rare, so less than occasional, so that it's a much more—that I'm looking for is a really predictable, relatively static environment.

(Tr. 140).  VE McManus testified that a medical records clerk and a food service worker would no longer be available in this second scenario.  (*Id.*).  The VE testified that the shelving clerk would remain an option, and that other jobs would be available as well. (Tr. 141).  These jobs would include a mail clerk (a light exertion position, with 99,140 jobs available nationally) and an addresser (a sedentary position, with 25,628 jobs available nationally).  (*Id.*).  The VE noted that other jobs would likely fit too.  (*Id.*).

For a third hypothetical person, ALJ O'Brien suggested:

[E]verything I gave you in hypothetical number two, but add that the individual is occasionally going to be unable to maintain attention and concentration on even simple tasks.

(Tr. 141-42). The VE testified "once the pattern is known, the person could not sustain employment." (Tr. 142). The VE indicated that if a person needed to lie down for two hours out of an eight-hour day, the person would be unable to maintain employment. (*Id.*).

## B.    Summary of the Medical Evidence

The Court assumes the parties' familiarity with the voluminous medical evidence in this case. Therefore, only a brief summary is necessary.

### 1.    Psychiatrist Dr. Wendy Rosen[2]

Dr. Rosen was Plaintiff's first psychiatrist to originally diagnose her with bipolar disorder. (Tr. 126). Dr. Rosen treated Plaintiff from 2006 to 2010. (*See* Tr. 453-75). A progress note from January 19, 2010, is the first record of Plaintiff's bipolar diagnosis. (Tr. 454). Dr. Rosen's notes described Plaintiff as being in a state of "total chaos." (*Id.*). Between January 2010 and March 2010, Dr. Rosen's notes described Plaintiff's mood and affect as low and depressed. (Tr. 532-35).

In April 2010, Dr. Rosen indicated that Plaintiff's mood appeared to improve. (Tr. 531). In June 2010, Plaintiff's mood was recorded as "good" but still unstable with ups-and-downs. (Tr. 458). Dr. Rosen's progress note from July 2010 stated that Plaintiff went on a job interview but was worried she would get lost. (Tr. 467). On September 23,

---

[2]    Dr. Rosen's progress notes are hand written and, in many instances, difficult to decipher.

2010, Dr. Rosen noted that Plaintiff was reaching stability. (Tr. 474). Dr. Rosen's notes then indicated that Plaintiff's mood improved during the Fall, and she maintained stability while starting to attend support groups. (*See* Tr. 522-25).

A July 2011 progress note stated that Dr. Rosen was worried because Plaintiff seemed to be "shopping around for alternatives," and that Plaintiff was smoking cannabis twice a week, which could negatively affect her medication. (Tr. 523).

### 2.    Kavitha Finnity, Ph.D.

Plaintiff saw Dr. Finnity once for a consultative examination, on January 3, 2011. (Tr. 477-79). Plaintiff had no doctor-patient relationship with Dr. Finnity. (Tr. 480).

According to Dr. Finnity's psychiatric evaluation, Plaintiff reported depressive symptoms including dysphoric mood, crying, hopelessness, loss of interest, loss of energy, and social withdrawal. (Tr. 477). Plaintiff's self-reported manic symptoms were inflated self-esteem and grandiosity, decreased need for sleep, flight of ideas, and increased goal-directed activity. (*Id.*). Plaintiff's depressive and manic phases lasted a few months each. (Tr. 477-78). Upon examination, Dr. Finnity found that Plaintiff could follow and understand simple directions and perform simple tasks, that she had some difficulty with attention, concentration and stress, that she could maintain a regular schedule, that she could learn new tasks and perform complex tasks, and that she could make appropriate decisions. (Tr. 479).

### 3.    Mental Residual Functional Capacity Assessment

A state examiner completed a mental residual functional capacity assessment of Plaintiff on February 9, 2011. (Tr. 482-84). The state consultant found that Plaintiff was

not significantly limited in her ability to: remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, interact appropriately with the general public, ask simple questions or request assistance, maintain social appropriate behavior and adhere to the basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals and make plans independently of others. (Tr. 428-83). The consultant found that Plaintiff was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain concentration and attention for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). The consultant did not find Plaintiff to be markedly limited in any area. (*Id.*).

The medical examiner opined that Plaintiff would have difficulty with attention and concentration, relating to others, and dealing with stress. (Tr. 484). Otherwise, the consultant believed Plaintiff retained "the ability to perform simple, low stress work." (*Id.*). Plaintiff had no restrictions on activities of daily living or difficulties in maintaining social function. (Tr. 496). The review found that Plaintiff had mild

difficulties maintaining concentration, persistence, or pace, and there was insufficient evidence to make a finding as to repeated episodes of deterioration. (*Id.*).

### 4.    Jennifer Fleeman, Psy. D.

Plaintiff met with Dr. Fleeman from the summer of 2010 to January 2011. (Tr. 504-18, 588-604). On June 15, 2010, Dr. Fleeman found that Plaintiff had a somewhat elevated mood, appropriate affect, and proper orientation. (Tr. 604). Plaintiff had an intact memory, was able to remain attentive throughout the interview, had no delusions or suicidal ideation, and had good judgment, insight, and impulse control. (*Id.*). Dr. Fleeman found that Plaintiff was dressed and groomed appropriately, and eager to share her medical history to receive help. (*Id.*). Dr. Fleeman diagnosed Plaintiff with Bipolar I Disorder, and noted marital discord, unemployment, parenting issues, and financial problems. (*Id.*).

On June 29, 2010, Dr. Fleeman observed that Plaintiff was excited about her plans and focused on her treatment. (Tr. 601). Plaintiff believed she may have been experiencing mania during this appointment. (*Id.*). Plaintiff met with Dr. Fleeman again on July 28, 2010, at which time Dr. Fleeman reported Plaintiff to be in a more stable mood. (Tr. 511). Likewise, during appointments in August and September, Dr. Fleeman found Plaintiff to be in a stable mood. (Tr. 508, 509). In October, Plaintiff noted increased irritability with her husband and questioned whether she was becoming manic. (Tr. 590). Dr. Fleeman noted that Plaintiff had a hard time distinguishing between normal irritability and symptomatic irritability. (*Id.*). In January 2011, Plaintiff self-reported an increase in hypomanic symptoms, but Dr. Fleeman reported that Plaintiff did

not seem to have an elevated mood. (Tr. 588). From February to June 2011, Dr. Fleeman's notes indicated that Plaintiff was stable, but she continued to have trouble distinguishing normal ups-and-downs from symptoms. (Tr. 582-86).

On June 29, 2011, Dr. Fleeman completed a form regarding Plaintiff's application for social security disability benefits. (Tr. 514-18). Dr. Fleeman indicated that she believed that Plaintiff had moderate restrictions on activities of daily living and social functioning. (Tr. 515). She indicated that Plaintiff had difficulties in concentration, persistence, or pace resulting in frequent failures to complete tasks in a timely manner, as well as repeated episodes of deterioration or decompensation in work or work-like settings, causing Plaintiff to withdraw from the situation or experience exacerbation of her symptoms. (Tr. 515-16).

Regarding work limitations, Dr. Fleeman determined that Plaintiff was not significantly limited in her ability to understand and remember short and simple instructions, ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation. (Tr. 516-17). Dr. Fleeman found Plaintiff moderately impaired in her ability to remember locations and work-like procedures, understand and remember detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with and proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or

exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting. (*Id.*). Dr. Fleeman determined that Plaintiff was markedly impaired in her ability to: perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others. (*Id.*).

### 5.    Marilyn Sullivan, NP

Plaintiff began treatment with NP Marilyn Sullivan in June 2011, and saw her through May 2012. (*See* Tr. 540-54, 565-78, 609-18). On her first visit, NP Sullivan found Plaintiff's mood to be slightly elevated, but observed that Plaintiff lost interest quickly and needed daily naps. (Tr. 544). Plaintiff had no thoughts of suicide, but when she was severely depressed, she wished she could die. (Tr. 546). NP Sullivan found that Plaintiff needed to change her diet and exercise to counteract weight gain resulting from her medications. (*Id.*). Otherwise, her indicators were normal. (Tr. 544-47). NP Sullivan stated that Plaintiff was mildly hypomanic and suffered from some side effects caused by her medications, but she was functional and in good control. (Tr. 547).

Progress notes from September 14, 2011, indicated that NP Sullivan thought Plaintiff would benefit from more frequent visits. (Tr. 541). On September 30, 2011, NP Sullivan found most of Plaintiff's mental status indicators to be good. (Tr. 540). Plaintiff's mood cycled monthly through depression, anxiety, and mania, and while her

impulse control had been poor in the past she seemed to be in control during the exam. (Tr. 540-41). NP Sullivan also noted that Plaintiff complained of some memory problems, but she was able to carry out three step commands. (Tr. 540).

On October 21, 2011, Plaintiff told NP Sullivan that her husband thought Paxil made her manic and cycle more. (Tr. 577). NP Sullivan diagnosed Plaintiff's bipolar disorder as in partial remission. (Tr. 578). NP Sullivan's progress notes from a visit on November 18, 2011, indicated that Plaintiff had more energy, was in a better mood, and was feeling good about completing her household chores. (Tr. 574).

On November 30, 2011, NP Sullivan recorded that Plaintiff was "distressed, anxious, and angry" due to familial problems. (Tr. 573). Plaintiff was worried she would "shut down" again because she had not received positive reinforcement from her family. (*Id.*). On December 6, 2011, Plaintiff's husband reported that Plaintiff was manic and escalating, and that Plaintiff's daughter had recently slapped her. (Tr. 572). Three days later, Plaintiff reported that things were going better with her husband, who said he felt burned-out. (Tr. 571). Plaintiff reported that she was doing well, but her husband thought she was manic or hypomanic. (Tr. 571).

On December 20, 2011, Plaintiff reported that her family was busier due to the holidays. (Tr. 569-570). While most members of her self-help group were in crisis, Plaintiff felt she was the healthiest. (*Id.*). On January 3, 2012, Plaintiff reported that her family did well over Christmas and that she was enjoying her support group. (Tr. 568).

On January 10, 2012, Plaintiff and her husband called NP Sullivan's office. (*Id.*). Plaintiff's husband reported that Plaintiff had been manic and had slapped him three

times, and he had yelled at her. (*Id.*). Plaintiff's daughter had slapped her as well. (*Id.*). The police gave the family a warning. (*Id.*). Following the incident, Plaintiff left to live with a friend for a few days, but returned home after an argument with the friend. (Tr. 567). All mental health indicators were normal. (*Id.*).

On February 15, 2012, Plaintiff reported that things had improved at home. (Tr. 617). Her mood was elevated but "good." (*Id.*). In March 2012, NP Sullivan reported that Plaintiff was cycling into a depressive state. (Tr. 615-16). She had low energy and found it hard to get up in the morning. (Tr. 616). Plaintiff found it hard to function and perform routine tasks. (*Id.*). NP Sullivan's notes no longer indicated that Plaintiff was in partial remission; instead, they described Plaintiff as "depressed, mild." (*Id.*).

Plaintiff returned to NP Sullivan on March 16, 2012, at which time Plaintiff and her husband felt that the other was abusive. (Tr. 614). On March 30th, Plaintiff reported feeling "overmedicated" on the higher dose of Depakote and the lower dose of Lithium. (Tr. 613). Her mood was mildly elevated, irritable, anxious, and angry. (*Id.*)

On April 11, 2012, NP Sullivan noted that Plaintiff was calmer and happier. (Tr. 612). NP Sullivan diagnosed her bipolar disorder as in partial remission. (Tr. 613). A note from May 9, 2012, indicated that Plaintiff had called NP Sullivan's office during that week to report that she had lowered her Lithium dosage because she experienced tremors and was feeling "cognitively foggy." (Tr. 612).

### 6. Rochester Mental Health Center

Plaintiff began treatment at the Rochester Mental Health Center ("RMHC") in July 2012, with Licensed Creative Arts Therapist ("LCAT") Alayne Gosson for

psychopharmocology and Dr. Eric Rennert for psychiatry. (Tr. 639-741). Plaintiff was relatively stable with the addition of Lithium, and it was determined that Plaintiff was likely not a threat to herself or others. (Tr. 640). Plaintiff's second visit to the RMHC was with Dr. Douglas Landy. (Tr. 656). During the mental status examination, most indicators seemed good. (Tr. 655). Dr. Landy diagnosed Plaintiff's bipolar disorder as in full remission. (*Id.*).

Plaintiff saw LCAT Gosson again on September 19, 2012. (Tr. 661). All factors on her mental status exam appeared good, and Plaintiff reported that she was adjusting well to her daughter being away at school. (*Id.*). Plaintiff reported feeling slightly hypomanic, but not out of control. (*Id.*). Plaintiff saw LCAT Gosson again on October 8, 2012. (Tr. 662). Plaintiff's dose of Lithium was decreased because she was feeling physically ill. (*Id.*). Plaintiff communicated that she was unhappy in her marriage. (*Id.*). Plaintiff desired to be stable enough to follow through on her plans once a week, and to be more involved with her self-help group. (Tr. 665).

On October 15, 2012, Plaintiff met with Dr. Michael Simson at RMHC. (Tr. 669). Dr. Simson questioned whether Plaintiff benefitted from the Lithium. (*Id.*). Plaintiff met with LCAT Gosson on November 1, 2012. (Tr. 671). Plaintiff wished to be on as little medication at as low a dose as possible, and she wanted to taper off Lithium altogether. (Tr. 671-72). On December 5, 2012, Plaintiff reported to LCAT Gosson that her primary care provider had reduced her Lithium dose. (Tr. 676). Plaintiff met with Dr. Rennert on December 12, 2012, where she was alert and pleasant, without any indication of hypomania, irritability, depressive features, paranoia, or acceleration. (Tr. 677).

Plaintiff met with LCAT Gosson again on January 2, 2013, and expressed her dissatisfaction with her marriage. (Tr. 679). Plaintiff met with Dr. Rennert on January 9, 2013, where she was alert and in good spirits, and reported that she had discontinued Lithium without any negative side effects. (Tr. 680). On January 30, 2013, Plaintiff returned to the RMHC and met with LCAT Gosson, where she reported that she felt more "lucid" and was happy to be working with Dr. Rennert. (Tr. 681).

Plaintiff met with LCAT Gosson again on March 27, 2013. (Tr. 688). Plaintiff noted that she had been experiencing memory problems, and that her primary stressor was her marriage. (*Id.*). Plaintiff also met with Dr. Rennert that day, where she expressed concerns about her mood swings. (Tr. 686). On September 18, 2013, Plaintiff was doing better emotionally and feeling better about her relationship with her children and her husband. (Tr. 737). On December 11, 2013, LCAT Gosson noted that Plaintiff was "doing well" and attending self-help groups. (Tr. 738). Plaintiff also met with Dr. Rennert on the same day, and appeared alert and in good control. (Tr. 739). Plaintiff expressed concerns about her family and said that the Depakote was working well, but she did not think the dose was correct. (*Id.*).

Plaintiff met with LCAT Gosson and Dr. Rennert again on April 2, 2014. (Tr. 740-41). Plaintiff seemed to be "at her limit" for responsibility, and was dealing with the stress of a full schedule. (Tr. 741). Plaintiff appeared alert, appropriately dressed, and groomed. (Tr. 740). Plaintiff discussed various stressors with Dr. Rennert, including her family dynamics and financial burdens. (*Id.*).

On July 16, 2014, Plaintiff explained to LCAT Gosson that she and her husband had agreed to separate after their son graduated high school. (Tr. 743). Plaintiff was confident that her marriage was a longstanding factor in her symptoms. (*Id.*). On the same day, Dr. Rennert found that Plaintiff's speech was a bit pressured, but not tangential, and that Plaintiff did not exhibit psychotic or morbid depressive features. (Tr. 742). Plaintiff wanted Dr. Rennert to make note of her struggles with "PMDD" as well as her history of exposure to Paxil, which may have led to a heightened degree of rapid mood cycling. (*Id.*). Plaintiff appeared to be in good control. (*Id.*).

On October 8, 2014, Plaintiff met with LCAT Gosson where she reported that she had been hypomanic over the last few weeks, but was handling it well. (Tr. 745). Plaintiff stated that she stepped back from a leadership role in her bipolar support group. (*Id.*). Plaintiff met with Dr. Rennert following this appointment. (Tr. 744). Plaintiff was well groomed, maintained direct eye contact and clear thought processes, but she appeared to have less energy and seemed pressured. (*Id.*). However, Plaintiff's control was intact, and she had recently visited relatives. (*Id.*).

On August 1, 2013, Dr. Rennert and LCAT Gosson completed a Medical Residual Functional Capacity Questionnaire (the "Questionnaire") concerning Plaintiff's ability to work. (Tr. 704-708). Plaintiff exhibited relative stability in her symptoms after several changes in her medications. (Tr. 704). Plaintiff was well-groomed, and she maintained good eye contact, coherent speech, and clear thought processes. (*Id.*). She did not exhibit agitation, paranoia, or psychosis. (*Id.*). Her judgment and insight appeared good,

and she reported periods of heightened energy and sadness. (*Id.*). Her prognosis was good with continued treatment. (*Id.*).

When asked to identify Plaintiff's signs and symptoms, Dr. Rennert and LCAT Gosson reported that Plaintiff exhibited impairment in impulse control, mood disturbance, bipolar syndrome with a history of episodic periods, moderate manic and depressive symptoms, and memory impairment—short, intermediate, or long term. (Tr. 705).

The form divided possible work impairments into a checklist based on 5 categories. (Tr. 706-07). Category I signified that Plaintiff was not precluded from any aspect of job performance. (Tr. 706). In this category, Dr. Rennert and LCAT Gosson placed the ability to interact with the general public and the ability to be aware of normal hazards and take appropriate precautions. (Tr. 707). Category II meant that performance was precluded for less than 10% of an 8-hour workday. (Tr. 706). In this category, Dr. Rennert and LCAT Gosson placed the ability to maintain regular attendance and be punctual within customary—usually strict—tolerances, and the ability to ask simple questions or request assistance. (Tr. 706-07). Category III meant that performance was precluded from 11-20% of an 8-hour workday. (Tr. 706). In this category, Dr. Rennert and LCAT Gosson placed the abilities to carry out very short and simple instructions, sustain an ordinary routine without special supervision, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, travel to unfamiliar places or use

public transportation, and to set realistic goals or make plans independently of others. (Tr. 706-07).

Category IV meant that performance was precluded for more than 20% of an 8-hour workday. (Tr. 706). Dr. Rennert and LCAT Gosson determined that Plaintiff had Category IV impairment in her abilities to remember work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out detailed instructions, maintain attention for two hour segments, work in coordination with or proximity to others without being unduly distracted, make simple, work-related decisions, accept instructions and respond appropriately to changes in a routine work setting, travel to unfamiliar places or use public transportation, and deal with normal work stress. (Tr. 706-07). Finally, Category V meant that performance was completely precluded in a regular work setting. (Tr. 706). In this category, Dr. Rennert and LCAT Gosson placed the abilities to maintain attention for two-hour segments, work in coordination with or proximity to others without being unduly distracted, make simple, work-related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and to deal with normal work stress. (Tr. 706-07). Some of the abilities were placed into more than one category. (*Id.*).

The Questionnaire asked Dr. Rennert and LCAT Gosson to explain any limitations that fell into the three most limited categories. (Tr. 707). They wrote that Plaintiff's symptoms and emotional ability were significantly limited. (*Id.*). Plaintiff successfully

maintained baseline stability with the expectations of attending her outpatient appointments and a peer support program. (*Id.*). However, increasing her stressors with regular employment would exacerbate her symptoms. (*Id.*). They reported that Plaintiff would be unable to perform work and/or be away from her work environment due to limitations from her symptoms for more than 30% of an 8-hour workday. (Tr. 707). LCAT Gosson and Dr. Rennert further stated that Plaintiff struggled to maintain her current low-stress involvement in social treatment programming, and that she had not worked in a competitive environment in over 6 years. (Tr. 708). They stated that Plaintiff's symptoms and resulting functional limitations would increase if she was working in a full-time position. (*Id.*). The added stress and pressure would exacerbate mood cycling, impulsivity, distractibility, and emotionality such that Plaintiff would not appear, present, or function normally in a work setting. (*Id.*).

## II.    The Commissioner's Decision Regarding Disability

### A.    Determining Disability Under the Social Security Act

For both Social Security Insurance and Disability Insurance Benefits, the Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 43 U.S.C. § 1382c(a)(3)(A); *see, e.g., Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3),

1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within

the meaning of the Act. *See, e.g.*, *Dragert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002).

The individual will only be declared disabled if his impairment is of such severity that he

is unable to do his previous work and cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful activity.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential

analysis. If the ALJ makes a determination of disability at any step, the evaluation will

not continue to the next step. 20 C.F.R. § 416.920(a)(4). The five steps are as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of

proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Carter*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

## B.    Summary of the ALJ's Decision

In applying the five-step sequential evaluation in this matter, ALJ O'Brien made the following determinations. First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2014. (Tr. 23). At step one of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2010, the alleged onset date of the disability. (*Id.*).

At step two, the ALJ found that Plaintiff suffered from a severe impairment: bipolar disorder. (*Id.*). At step three, the ALJ found that this impairment did not qualify as an impairment listed in Appendix I. (Tr. 24).

Since Plaintiff's severe impairment failed to meet the standards of a listing under Appendix I, ALJ O'Brien assessed Plaintiff's Residual Functional Capacity ("RFC") in step four of the sequential analysis. (Tr. 26-31). The ALJ found that Plaintiff:

> [H]ad the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant cannot climb a rope, ladder or scaffold. She needs to avoid hazards such as open waters and unprotected heights. She can perform simple, three step tasks. She can tolerate no more than less than occasional changes in work setting. She can work to meet daily goals, but not maintain an hourly, machine-driven, assembly line production rate. She can occasionally interact with the public at Dictionary of Occupational Titles people function levels 6, 7, and 8 (defined as speaking or signaling; serving; and helping or taking instructions). She cannot perform teamwork. She can occasionally make work-related judgments or decisions. She requires up to three short, less than five-minute breaks in addition to the regularly scheduled breaks.

(Tr. 26). ALJ O'Brien "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . ." (*Id.*).

ALJ O'Brien summarized Plaintiff's testimony and then reviewed the medical evidence in the record. (Tr. 26-31). The ALJ noted that while NP Sullivan did not provide a medical opinion, her examination findings were "consistent with the record and with [Plaintiff]'s activities," and thus, ALJ O'Brien used her findings to develop Plaintiff's RFC. (Tr. 27-28). The ALJ then reviewed Dr. Fleeman's medical statement and her examination findings. (Tr. 28). Although Dr. Fleeman noted numerous work limitations that would cause moderate or marked impairment with Plaintiff's performance in an employment setting, ALJ O'Brien gave her opinion "little weight" finding that her conclusions were unsupported by her own progress notes and conflicted with some of NP Sullivan's examination findings. (*Id.*).

The ALJ turned to LCAT Gosson and Dr. Rennert's opinion within the Questionnaire. (*Id.*). For similar reasons, the ALJ discredited their ultimate conclusion regarding Plaintiff's performance in a work setting because she found that their progress notes were inconsistent with the opinion that Plaintiff would be significantly limited in normal functionality. (Tr. 28-29). The ALJ granted their opinion "some weight, as the clinical findings [were] consistent with the established evidence of record including the mental status examinations performed by N[P] Sullivan." (Tr. 29). However, the ALJ discounted their "opinions" as stated in the Questionnaire. (*Id.*).

The ALJ then reviewed Dr. Finnity's findings. (Tr. 30). After noting several positive findings in Dr. Finnity's report, ALJ O'Brien indicated that while Dr. Finnity's results "appeared to be consistent with [Plaintiff's] allegations, Dr. Finnity did not opine that the claimant was disabled or unable to work." (*Id.*). The ALJ granted Dr. Finnity's opinion "more weight" due to her background, and because her opinion was consistent with her clinical findings and Plaintiff's reported level of activity. (*Id.*).

The ALJ also reviewed several letters from Plaintiff's husband and mother-in-law, which described their observations of Plaintiff's behavior, as well as Plaintiff's Global Assessment of Functioning ("GAF") scores. (Tr. 30-31). The GAF scores are "a subjective measure of functioning" that "is relative to who is making the assessment, and how the claimant appears at that very moment." (Tr. 31). The ALJ determined that despite "some swings," Plaintiff's GAF scores were consistent with the examination notes, and appeared to indicate that Plaintiff improved with treatment and was "often stable." (*Id.*). Finally, the ALJ gave "little weight" to the state medical consultants' assessments. (*Id.*). The ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," these impairments were not so extensive so as to warrant a finding of disability. (*Id.*).

At step five, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 31-32). The ALJ also found that Plaintiff fell within the age category defined as a younger individual on the alleged disability onset date, and noted that Plaintiff had at least a high school education and was able to communicate in English. (Tr. 32).

Considering her age, education, work experience, and RFC, ALJ O'Brien found that jobs existing in significant numbers within the national economy that Plaintiff could perform. (Tr. 32-33). ALJ O'Brien indicated that the VE testified that an individual in Plaintiff's position would be able to hold several jobs, such as: mail clerk, shelving clerk, and addresser. (Tr. 33). Thus, ALJ O'Brien entered a finding of "not disabled." (*Id.*).

## DISCUSSION

Plaintiff asserts that ALJ O'Brien "failed to provide a good reason for rejecting the treating source statements supporting [Plaintiff's] allegations of disability." (Dkt. 9-1 at 22). Specifically, Plaintiff argues that ALJ O'Brien failed to properly credit the opinions of Drs. Fleeman and Rennert, and as a result, the ALJ's decision should be reversed and remanded for further proceedings. (*Id.* at 22-29). Plaintiff also argues that ALJ O'Brien's interpretation of Dr. Finnity's statement was adversarial and inconsistent with the ALJ's duty to develop the record. (Dkt. 9-1 at 29-30).

## I.    Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)). The Social Security Act directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial

evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chafer*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *See Sellers v. MC. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

## II.    The ALJ Erred in Failing to Grant Proper Weight to Treating Provider Opinions

An ALJ is required to consider every medical opinion received by the Social Security Administration and to review all available evidence. 20 C.F.R. § 404.1527(c); *Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012). An ALJ must weigh certain factors in evaluating both treating and non-treating source statements, including the nature, length, and extent of the treating or examining relationship, as well as whether the medical opinion is supported by, and consistent with, medical signs and laboratory findings. 20 C.F.R. § 404.1527(c). After considering these factors, "the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). An ALJ "is not permitted to substitute his own expertise or view of the medical proof . . . for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations. . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regarding "the nature and severity of [the claimant's] impairment(s) . . . [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* § 404.1527(c)(2). To discredit a treating physician's opinion, "the ALJ must explicitly consider, inter alia: (1)

the frequent[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).

"'Where the treating physician rule has been applied incorrectly, a decision by the [Commissioner] denying benefits cannot be upheld on the grounds that the denial is supported by substantial evidence.'" *Golden v. Sec'y of Health & Human Servs.*, 740 F. Supp. 955, 960 (W.D.N.Y. 1990) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Significantly, "[i]n cases where the [p]laintiff alleges a disability primarily based on a mental impairment, the treating physician's opinion may be more important still." *Drake v. Astrue*, No. 07-CV-377, 2008 WL 4501848, at *4 (W.D.N.Y. Sept. 30, 2008); *see Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health.").

Remand is required when an ALJ fails to adequately evaluate the weight of a medical opinion in light of the factors set forth in 20 C.F.R. § 404.1527(c), *see, e.g.*, *Evans v. Colvin*, 649 F. App'x 35, 29 (2d Cir. 2016), and requires the ALJ to consider "the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010); *see, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). "[T]he Second Circuit has instructed that the courts should not . . . hesitate to

remand when the Commissioner has not provided good reasons for the weight given to a treating physician[']s opinion or when the ALJ's opinion does not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 578 (W.D.N.Y. 2014) (internal quotation and citations omitted).

Here, Plaintiff was treated by multiple physicians over the course of several years. (*See generally* Tr. 445-731). Her most recent long-term treatment relationship was with Dr. Rennet and LCAT Gosson at RMHC. (Tr. 639-741). The record indicates that she attended appointments at RMHC from July 2012 until October 2014, (*id.*), and that she had 14 appointments with these providers (Tr. 704). Furthermore, there is no dispute that Dr. Rennert was one of Plaintiff's "treating physicians." (Dkt. 9-1 at 22; Dkt. 17 at 8).

Plaintiff argues that ALJ O'Brien did not analyze Dr. Rennert's explanation for his ultimate assessment of Plaintiff's work-related restrictions. (Dkt. 9-1 at 26). Specifically, Dr. Rennert explained that although Plaintiff was exhibiting stability during appointments, additional stressors from a work setting would likely exacerbate her symptoms. (Tr. 708). Defendant argues that ALJ O'Brien did not need to grant controlling weight to the treating physicians' opinions because their opinion did not square with their own treatment notes, or the opinions of NP Sullivan and consultative examiner Dr. Finnity. (Dkt. 17 at 8).

The ALJ's decision did not address the fact that Dr. Rennert's opinion regarding Plaintiff's disability was based on his conclusion that these added stressors would significantly impact Plaintiff's mental state. (*See* Tr. 28-29, 707-08). Instead, the ALJ emphasized that Dr. Rennert's and LCAT Gosson's progress notes appeared generally

positive, which conflicted with their final determination. (Tr. 28-29). "It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004). The evaluation of a treating physician's opinion regarding a claimant's capacity to work under the rigors of a competitive work environment is critical to an ALJ's determination. *See Mahon v. Colvin*, No. 15-CV-02641 (PKC), 2017 WL 1232471, at *15 (E.D.N.Y. Mar. 31, 2017) (finding that the plaintiff's treating physicians "opined that work stress could exacerbate [the plaintiff's] symptoms" and that "reports of activities such as traveling and volunteering, say nothing about her ability to *maintain regular commitment and stability in a work environment*" (emphasis added)); *Chapman v. Plan Admin. Comm. of Citigroup, Inc.*, No. 06-CV-6444 CJS, 2008 WL 141632, at *6 (W.D.N.Y. Jan. 14, 2008) ("[T]he Court notes that although [the p]laintiff's treating physicians uniformly concluded that a return to a high-stress work environment would be harmful to [the p]laintiff's cardiac health, [the ALJ] offered no opinion on that point. [The d]efendant's failure to address that issue was arbitrary and capricious.").

Dr. Rennert explained that a return to the stresses of a full-time work environment—after a six-year absence—would overwhelm Plaintiff's ability to productively function due to her mental disorder. (Tr. 707-08). Dr. Rennert and LCAT Gosson opined that Plaintiff had informed them that her symptoms would sometimes overwhelm her—even within a low-stress environment—and Dr. Rennert determined that "increasing the stressors with regular employment would [only] exacerbate the symptoms

- 37 -

more so." (Tr. 707). Indeed, Dr. Rennert explicitly indicated that Plaintiff's symptoms would be different under working conditions: "Stress and pressure do exacerbate mood cycling and impulsivity, distractability, [and] emotionality such that [Plaintiff] would not appear, present[,] or function normally in a work setting." (Tr. 708). Dr. Fleeman's opinion that Plaintiff would be moderately or markedly impaired in performing within a work environment without symptomatic interruptions was plainly consistent with these findings. (Tr. 516-17). Despite the conclusions of Plaintiff's treating physicians, the ALJ improperly substituted her own interpretation of the progress notes in discrediting Drs. Fleeman and Rennert's opinions, which did not account for how Plaintiff would specifically react to an employment setting. *Greek*, 802 F.3d at 375; *see Manson v. Colvin*, No. 7:15-CV-0676(GTS), 2016 WL 4991608, at *11 (N.D.N.Y. Sept. 19, 2016) ("[A]n ALJ cannot assess a plaintiff's RFC based on the ALJ's own interpretation of the medical evidence" (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998))).

An ALJ cannot simply note perceived inconsistencies in the medical records without also adequately applying the treating physician rule. *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 506-09 (S.D.N.Y. 2014). The treating physician rule "imposes on the Commissioner a heightened duty of explanation when a treating physician's medical opinion is discredited." *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 n.1 (2d Cir. 2010). ALJ O'Brien never discussed Dr. Rennert's explanation even though this conclusion was consistent with the progress note recorded on April 2, 2014, which noted Plaintiff's increased stress—finding her to be "at her limit" for responsibility—due to the burden of a full schedule. (Tr. 741). ALJ O'Brien was not "entitled to select

between the conflicting evidence in the record without following the treating physician rule, which required properly addressing Dr. [Rennart]'s diagnosis on its merits." *Rolon*, 994 F. Supp. 2d at 508-09 (quotations and citations omitted). Furthermore, the ALJ acknowledged that Dr. Rennert found "[Plaintiff's] symptoms [were] at times beyond [Plaintiff's] control," but dismissed this finding because Dr. Rennert based this determination on Plaintiff's "self-reporting." (Tr. 29; *see* Tr. 707). However, "[t]he fact that [Dr. Rennert] . . . relied on [Plaintiff's] subjective complaints hardly undermines his opinion as to [Plaintiff's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." *Lopez-Tiru v. Astrue*, No. 09-CV-1638 ARR, 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011) (quotation and citations omitted); *see Khan v. Astrue*, No. 11-CV-5118 MKB, 2013 WL 3938242, at *19 (E.D.N.Y. July 30, 2013) ("[I]t is acceptable to rely on self-reported symptoms when diagnosing mental impairments.").

Without addressing how Plaintiff's mental disorder would impact her in a work environment, and by basing her opinion solely on the controlled ecosystem of the examination room, ALJ O'Brien failed to provide "good reasons" for the lack of weight she placed on the treating physicians' opinions.[3] Although Dr. Rennert was Plaintiff's treating psychiatrist, who had treated Plaintiff for about 22 months over several sessions, ALJ O'Brien granted Dr. Finnity's opinion—developed after just one examination— "more weight." *See generally Garcia v. Colvin*, No. 15-CV-5516 (SAS), 2016 WL

---

[3]     Notably, Dr. Finnity—whom the ALJ granted "more weight"—also determined that Plaintiff had "some difficulty relating with others and *dealing with stress*." (Tr. 479 (emphasis added)).

845282, at *7 (S.D.N.Y. Mar. 3, 2016) ("[I]t was error to assign 'significant weight' to the opinion of a consulting psychiatrist who evaluated [the plaintiff] a single time while completely disregarding the opinion of Dr. Kury who evaluated [the plaintiff] at least eleven times."). The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. By granting Dr. Finnity's opinion the most weight in her determination, ALJ O'Brien failed to adhere to this admonishment. "[T]he inappropriateness of the ALJ's reliance on th[is] 'snapshot' opinion[] of the consultative examiner[] is particularly acute here, given Plaintiff's diagnosis of bipolar disorder, which means that she is someone who, by definition, fluctuates between two very different states." *Mahon*, 2017 WL 1232471, at *16.

Furthermore, ALJ O'Brien's rationale for granting "more weight" to Dr. Finnity is untenable. First, the ALJ stated that Dr. Finnity was "an acceptable medical source who has had the opportunity to personally examine the claimant, review the claimant's medical records, and is knowledgeable of Social Security regulations and the standard of disability." (Tr. 30). It is unclear how this assertion causes Dr. Finnity to be any more qualified than Dr. Rennert, who—unlike Dr. Finnity—had the opportunity to personally examine Plaintiff several times over. (Tr. 704). The ALJ also stated that Dr. Finnity's opinion was consistent with her clinical findings, (Tr. 30), but this asserted distinction lacks persuasive force where the ALJ failed to consider Dr. Rennert's explanation of how Plaintiff's symptoms would change in a work setting. Dr. Finnity indicated that the "[r]esults of [her] evaluation appear[ed] to be consistent with [Plaintiff's] allegations."

(Tr. 479). Thus, it is notable that Dr. Rennert determined that the additional stressors of a competitive work environment would prevent Plaintiff from functioning normally based, in part, upon Plaintiff's own complaints. (Tr. 707). Lastly, ALJ O'Brien's finding that Dr. Finnity's report was "consistent with the level of activity that [Plaintiff] performs" is not a sufficient reason to give more weight to a consultative physician. *Mahon*, 2017 WL 1232471, at *16 (finding that the ALJ was "required to give a much more detailed explanation of why he gave great weight to the opinions of [the consultative examiners]" and simply concluding that "these opinions deserved deference because they were consistent with [the p]laintiff's reported activities of daily living is insufficient").

Although the ALJ is not required to recite a mechanical incantation of the factors for determining the weight of a treating physician's opinion, she is required to "explicitly consider" each factor in her decision. *Reyes v. Colvin*, No. 13CV4683, 2015 WL 337483, at *16 (S.D.N.Y. Jan. 26, 2015). Here, it is unclear whether the ALJ considered all the factors in discrediting Drs. Fleeman and Rennert's opinions. *See, e.g.*, *Hussain v. Astrue*, No. 07-CV-210C, 2008 WL 4724301, at *4 (W.D.N.Y. Oct. 24, 2008); *Tornatore v. Barnhart*, 2006 WL 3714649, *3 (S.D.N.Y. Dec. 12, 2006). Therefore, the Court concludes that ALJ O'Brien failed to provide "good reasons" for her decision to grant Dr. Fleeman's opinion "little weight" and Dr. Rennert and LCAT Gossan's opinion "some weight," and this error warrants remand. *See Snell*, 177 F.3d at 133; 20 C.F.R. § 404.1527(c).

### III. The ALJ's Interpretation of Dr. Finnity's Opinion Was Speculative

Plaintiff also contends that ALJ O'Brien's interpretation of Dr. Finnity's consultative opinion was adversarial and speculative, and that ALJ O'Brien should have re-contacted Dr. Finnity for clarification. (Dkt. 9-1 at 29-30). The Court does not find that ALJ O'Brien took an adversarial position against Plaintiff in her construction of Dr. Finnity's consultative opinion, but the Court agrees that Dr. Finnity's opinion was too vague and invited the ALJ to speculate upon the significance of the report in the RFC determination.

Dr. Finnity's report indicated that Plaintiff was "dressed appropriately and well groomed," her speaking skills were clear and adequate, and her thought processes were "[c]oherent and goal directed." (Tr. 478). Plaintiff also demonstrated appropriate speech and thought content, and was oriented in "[p]erson, place, and time." (*Id.*). Plaintiff "was able to do serial 3s accurately," and she could "recall 3 out of 3 objects immediately and 2 out of 3 objects after five minutes." (*Id.*). Plaintiff could also repeat "5 digits forward and 4 digits backward." (*Id.*). Her cognitive function was "average," and her insight and judgment were deemed to be "fair to good." (Tr. 478-79). Dr. Finnity also noted that Plaintiff was able to maintain her hygiene, socialize with friends, and handle simple household chores. (Tr. 479).

Dr. Finnity opined:

The claimant can follow and understand simple directions and perform simple tasks. She has some difficulty with attention and concentration. She can maintain a regular schedule. She can learn new tasks and perform complex tasks. She can make appropriate decisions. She has some

difficulty relating with others and dealing with stress. Results of the evaluation appear to be consistent with allegations.

(*Id.*). Dr. Finnity diagnosed Plaintiff with bipolar disorder, NOS, and "recommended that [Plaintiff] continue with psychological and psychiatric treatment." (*Id.*). Plaintiff's prognosis was "fair to good." (*Id.*).

Plaintiff's argument that the phrase "some difficulty" is "most logically" interpreted to mean that "the difficulties would be disabling" is unavailing. (*See* Dkt. 9-1 at 30). Certainly, it cannot be reasonably disputed that "some difficulty" may imply varying degrees of hardship; however, therein lies the problem. Dr. Finnity's opinion that Plaintiff would have "some difficulty with attention and concentration" and "some difficulty relating with others and dealing with stress" was too broad to assist the ALJ in determining a proper RFC. *See, e.g., Selian*, 708 F.3d at 421 ("What Dr. Naughten means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation."); *Williams v. Colvin*, No. 16-CV-2293 (ADS), 2017 WL 3701480, at *4 (E.D.N.Y. Aug. 25, 2017) ("Although Dr. Acer found that the [p]laintiff 'may have difficulty maintaining attention and concentration, learning and performing complex tasks independently, adequately relating with others, and dealing with stress [,]' this mild diagnosis was not helpful to the ALJ." (citation omitted)); *Kain v. Colvin*, No. 14-CV-650S, 2017 WL 2059806, at *4 (W.D.N.Y. May 15, 2017) (finding that the consultative physician's opinion that the plaintiff would require "comfort breaks" was too vague and invited speculation). "The Second Circuit has long recognized that 'where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical

history even when the claimant is represented by counsel.'" *Kain*, 2017 WL 2059806, at *4 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). The ALJ should have contacted Dr. Finnity for additional information and clarification regarding her examination findings. Upon remand, the ALJ should pursue such clarification to assist in the proper disposition of Plaintiff's claim. *Rosa*, 168 F.3d at 83.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 17) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 9) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated:       September 6, 2017
             Rochester, New York